IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JEANIE K. WARNKEN, | ) | 4:06CV3009 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

  This is a social security appeal. Jeanie K. Warnken ("Warnken" or "Mrs. Warnken") was last insured for Social Security disability benefits on June 20, 1982. More than twenty years later, she filed an application for benefits and a period of disability, alleging disability resulting from multiple sclerosis (sometimes, "MS"). The Administrative Law Judge ("ALJ") denied the application after finding that Warnken did not establish that she met the duration requirement prior to the date she was last insured for benefits. Warnken asserts that the ALJ erred in concluding that the duration requirement must be established solely by objective medical evidence. I agree, and will reverse and remand to the Commissioner for further proceedings consistent with this opinion.

## *I. BACKGROUND*

  I first summarize the procedural history of this case. After that, I briefly explain the nature of multiple sclerosis and then review the medical evidence of record. I then summarize the other evidence before the ALJ. Finally, I review the ALJ's decision.

### A. *Procedural History*

Warnken filed an application for social security disability benefits on September 16, 2002, alleging that she became unable to work because of a "disabling condition" on January 1, 1976. (Tr. 41.) Her insured status expired on June 30, 1982. (Tr. 13.) At an October 20, 2004 hearing before an ALJ, Warnken amended the onset date to June 28, 1980. (Tr. 14, 282.) Thus the ALJ was required to look back over twenty-two years and decide whether on or before June 28, 1980, Warnken was unable to engage in any substantial gainful activity by reason of a medical impairment which had lasted or could be expected to last for not less than twelve months. See 42 U.S.C. § 423(d)(1). This twelve month period is the "duration requirement." On March 31, 2005, the ALJ denied benefits, finding that Warnken had failed to show that she met the duration requirement prior to expiration of her insured status. (Tr. 14.) The Appeals Council denied review. (Tr. 4.)

### B. *Nature of Multiple Sclerosis*

General understanding of the signs and symptoms of multiple sclerosis, as well as the process of diagnosis, is necessary background for resolution of the issues before me in this case. I begin with the observations of the Eighth Circuit:

> Multiple sclerosis is an autoimmune disorder in which the insulating sheath surrounding nerve fibers is destroyed and replaced by scar tissue, causing nerve communication to be disrupted. Symptoms, which vary widely from person to person and from stage to stage of the disease, include muscle weakness, numbness, fatigue, loss of balance, pain, and loss of bowel and bladder control. Most often the disease remits and relapses, but it may progress without remissions or with periodic plateaus or minimal improvements. <u>No single test confirms a diagnosis</u>, but magnetic resonance imaging can reveal the areas of scar tissue. See Sloane-Dorland Annotated Medical-Legal Dictionary 632-33 (1987), supp. at 470-71 (1992).

Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (emphasis added).  In plainer terms,

> Multiple sclerosis (MS) is a chronic, potentially debilitating disease that affects the central nervous system, which is made up of the brain and spinal cord.  Doctors and researchers think the illness is probably an autoimmune disease, which means that [the] immune system attacks part of [the] body as if it's a foreign substance.
>
> In multiple sclerosis, the body incorrectly directs antibodies and white blood cells against proteins in the myelin sheath, which surrounds nerves in your brain and spinal cord.  This causes inflammation and injury to the sheath and ultimately to the nerves that it surrounds. The result may be multiple areas of scarring (sclerosis).  Eventually, this damage can slow or block the nerve signals that control muscle coordination, strength, sensation and vision.

Mayo Clinic Online Disease & Condition Center for Multiple Sclerosis, Introduction, available at http://www.mayoclinic.com/health/multiple-sclerosis/DS00188/DSECTION=1.

A multiple sclerosis diagnosis may be based on, among other things:  medical history; neurological examination; observation of gait, posture, coordination and balance; ability to answer questions, indicating the clarity of thinking, judgment and memory; magnetic resonance imaging (MRI) scan (which may reveal multiple sclerosis lesions caused by myelin loss); and a spinal tap (also called a lumbar puncture).  When a spinal tap is performed, a small amount of cerebrospinal fluid is removed and analyzed, for abnormal levels of Immunoglobin-G and other substances. This procedure can also help rule out viruses and other conditions that can cause neurological symptoms.   Id., Screening & Diagnosis, available at http://www.mayoclinic.com/health/multiple-sclerosis/DS00188/DSECTION=6; Robert J. Fox, M.D. & Patrick J. Sweeney, M.D., Multiple Sclerosis, reviewed May 10, 2004, at page 4  (available at http://www.clevelandclinicmeded.com/

diseasemanagement/neurology/multsclerosis /multsclerosis.htm).

The diagnostic criteria for multiple sclerosis have changed since the alleged onset of Warnken's disability in 1980. Under the criteria in use at the time Warnken was allegedly disabled by multiple sclerosis, there were several categories of multiple sclerosis diagnosis, and one of them was "probable MS." Diagnosis was based on "CNS [central nervous system] lesions disseminated in space and time, and the elimination of alternative diagnoses . . . render[ing] MS a diagnosis of exclusion, which continues today." Multiple Sclerosis, at page 4. The diagnostic criteria for multiple sclerosis did not include MRI results until 1983. Most recently, and in 2001, new criteria were established which reduce the diagnostic classifications to "Definite MS" and "Possible MS." The 2001 criteria have limited use in everyday practice, as "the diagnostic classification scheme and MRI criteria are very complicated and tedious . . . ." Id.

With this understanding of multiple sclerosis as background, I will summarize the salient portions of the medical evidence.

### C.  Medical Evidence

Warnken was hospitalized at Lincoln General Hospital in Lincoln, Nebraska twice in 1978. During the first hospitalization, from February 10 to 12, 1978, R.C. Sposato, M.D. noted vision problems with her left eye and decreased sensitivity in the right lower extremities. A spinal tap was performed and X-rays of the back were taken. Upon physical examination, Dr. Sposato noted "[p]robable diagnosis is multiple sclerosis, although we will rule out an arteritis or inflammatory arthritic." (Tr. 249.) The discharge summary shows a diagnosis of "retrobulbar neuritis" and "Devic's syndrome or dorsacolumn lesion about L-2 or L-3 . . . ." (Tr. 249.) Dr. Sposato's notes indicate: "It is my impression that although the IgG of her spinal fluid is normal, that the likely diagnosis is disseminated sclerosis. This was discussed

with the patient, including the fact that I recommended to her that she not become pregnant as it would likely cause exacerbation of her disease." (Tr. 246.)

Warnken was hospitalized a second time at Lincoln General Hospital. The only record of this hospitalization is Dr. Sposato's neurological evaluation on April 14, 1978. The record of that evaluation gives Warnken's history between the two 1978 hospitalizations. The history indicated that Warnken "did fairly well" for two weeks after the February, 1978 hospitalization, until she had the flu and noticed "exacerbation of her difficulties with her vision and increased unsteadiness of her lower limbs . . . and again . . . note[d] pain in her back radiating down the lower left limb." After she was placed on Dilantin[1] there was "some" but "not much" improvement in the left lower limb. Just prior to her April 14, 1978 admission to the hospital, she was again able to read the newspaper with her left eye. She reported that her pain was exacerbated by movement and by standing. "Her life had consisted primarily of going to the bathroom, to the couch, to the bedroom, etc. . . . Her husband . . . has been making meals and her mother has been doing the vacumning." (Tr. 242.)

Upon April 14, 1978 examination, Dr. Sposato noted reduced acuity in Warnken's left eye (she was only able to read the largest of magazine print), a pronounced limp because she was not able to comfortably bear weight on her left leg, and compromised position sense and vibration. (Tr. 243-44.) Sposato stated that it was his "impression that the patient has multiple sclerosis and an acute radiculopathy[2]. Whether this is secondary to her MS, to her previous surgery, to scar tissue, to another [sic]. This I am unable to ascertain at this time." (Tr. 244.)

---

[1] Dilantin is an antiepileptic medication used to control seizures. Physician's Desk Reference 2153 (60th Ed. 2006).

[2] Radiculopathy is a disorder of the spinal nerve roots. Stedman's Medical Dictionary (Stedman's) 1503 (27th ed. 2000).

-5-

Warnken was hospitalized in 1980 at Lutheran Hospital in Beatrice, Nebraska. There are no medical records from this hospitalization, as the hospital was closed in 1984 and its records destroyed. (Tr. 85, 284.) The treating doctor's records were destroyed after his death. (Tr. 284.) The only evidence of this hospitalization is an interview with Shirley Frerichs, L.P.N, who provided nursing care to Warnken in July, 1980 at Lutheran Hospital. (Tr. 86.) Ms. Frerichs specifically remembered Warnken because she "made an impression," as "she was incapacitated at the time . . . and struggled to get better." (Tr. 88.) Ms. Frerichs recalled that Warnken couldn't walk, had difficulty with speech, could not feed herself, had to be bathed, and "was totally dependent on us [the hospital staff]." (Tr. 87.) When asked to confirm Warnken's recollection that she was hospitalized for two months in 1980, Ms. Frerichs said that "sound[ed] about right," as "I do know it was a long time." (Tr. 87.)

From March 21 to March 31, 1982, Warnken was again hospitalized at Lutheran Hospital. Warnken went to the hospital after injuring her back in a fall. She complained of nausea and vomiting. (Tr. 228.) An x-ray showed "rather marked" degenerative disc changes at L-5, lesser changes at L-4 and degenerative changes in the low lumbar spine. (Tr. 226.) An upper GI series showed abnormalities (which Warnken claims are symptoms of her multiple sclerosis): a "rather marked" post-bulbar spasm, gastric hypersecretions, a stomach that emptied very slowly and a marked amount of feces in the colon. (Tr. 227.) The discharge summary indicates a final diagnosis of "multiple sclerosis, urinary tract infection, duodenal bulb spasm, gastric hypersecretion, and disc degenerative changes, L5 and L4." (Tr. 228.) She "was treated and improved," [h]er Cortisone was increased[3] because of her flare-up of her multiple sclerosis [and S]he was dismissed to continue her convalescence at home, to return on an out patient basis." (Tr. 228.)

---

[3]This is noteworthy because the ALJ erroneously stated that there was no record of medication changes. (Tr. 14.)

There was one more hospitalization prior to the date Warnken's insured status expired. A Lutheran Hospital "progress record" completed by Warnken's then-treating doctor, L. D. Moell, M.D., indicates that Warnken was admitted on April 12, 1982 and dismissed on April 26, 1982. She was admitted with nausea and vomiting and a laceration on her lower lip. Dr. Moell's note indicates that she had been on prednisone. She was treated for her gastric problems with antacids and Tagamet, had physical therapy[4], "improve[d] and [was] dismissed to continue her convalescence at home." The final diagnosis was a laceration to her lower lip, multiple sclerosis, gastric hypersecretion, and an atonic[5] bladder. (Tr. 225.)

In June, 2004, Jay D. Crowder, M.D. (Warnken's then-treating physician) was asked for a retrospective diagnosis of the onset of disability. Dr. Crowder said she "probably was disabled as early as 1982 to 1984, when from records it looks like she was having signs of optic neuritis and other signs related to MS." Although it is unclear what records were reviewed[6], Dr. Crowder did not have the information from the nurse who cared for Weldon in 1980, any records from that 1980 hospitalization or the lay evidence relating to Warnken's condition during and after her 1980 hospitalization. Accordingly, Dr. Crowder's opinion does not preclude a retrospective diagnosis of onset during 1980.

---

[4]The ALJ erroneously noted that Warnken had never been referred for physical therapy. (Tr. 14.)

[5]"Atonic" means "[r]elaxed; without normal tone or tension." Stedman's at164.

[6]Dr. Crowder states that "just on review of our records from Dr. Weldon, I cannot really form an opinion on when Jeanie became 100% disabled" and refers to when "Dr. Weldon saw her in 1987." (Tr. 277.) During Warnken's 1987 treatment at Lincoln General Hospital, Warnken was treated by Dr. Sposato. (Tr. 246-49.) By September 1987, Warnken was treated by Dr. Weldon. (Tr. 220.) Reports from other doctors indicate that Warnken was treated by Dr. Moell in Beatrice, and hospitalized in Beatrice, Nebraska, prior to the expiration of her insured status. (Tr. 225-28.) Dr. Moell is now deceased and his records were destroyed. The Beatrice hospital and its records no longer exist.

### *D. Evidence before the ALJ*

Warnken and her husband testified at the hearing. Warnken testified that after her 1980 hospitalization she was unable to care for herself and unable to function independently in her home. (Tr. 289.) Mr. Warnken testified that his wife used a wheelchair and then a walker for at least a year after she was discharged from the 1980 hospitalization. (Tr. 292-93.) After that hospitalization, her vision was blurry and she could not read the newspaper. (Tr. 294.) She lacked stamina, and most people could not understand her speech. (Tr. 295-96.) She had worked until a few days before the hospitalization. (Tr. 296.)

The evidence before the ALJ included transcripts of interviews by Warnken's attorney with several witnesses. (Tr. 85-116.) They included the nurse who provided care during the 1980 hospitalization, Warnken's former sister-in-law (who regularly saw Warnken from the time of the 1980 hospitalization to her 1982 divorce), the woman who supervised Warnken at the job she held until shortly before the 1980 hospitalization, Warnken's sister, and the wife of Mr. Warnken's employer. Without going into detail, all had an opportunity to observe Warnken during or after the 1980 hospitalization, and if their statements are found credible and not in conflict with medical evidence of record, would establish that Warnken was disabled after the hospitalization. The ALJ very briefly noted this evidence but did not consider it.

### *E. The ALJ's Decision*

At stage two of the sequential evaluation, the ALJ found that although "[t]he medical evidence establishes [that] while the claimant had multiple sclerosis prior to the date last insured, there is insufficient medical evidence to establish twelve continuous months of disability." (Tr. 13.) The ALJ stated that although he "would like to issue a favorable decision," he was "bound by the available objective medical evidence, of which there is a paucity prior to the date last insured . . . ." (Tr. 13.) The ALJ did not explain two key reasons for the "paucity" of evidence: the doctor who

treated Warnken in 1980 retired and his records were destroyed and the hospital where Warnken was treated in 1980 no longer exists. (Tr. 284.)

The ALJ commented that "the medical record prior to June 1982 [the date last insured] consists of only two hospital workups in 1978, which suggested MS, and Dr. Moell's 1982 diagnosis of MS."[7] (Tr. 13.) The ALJ noted that no hospital treating notes from the 1980 hospitalization were in the file, and concluded that "it is impossible to assess the level of function regained after the 1978 acute episode or any subsequent episode prior to the date last insured." (Tr. 13-14.)

Observing that lay evidence carried less weight than objective medical evidence from treating physicians or hospital/clinic staff, the ALJ briefly noted lay testimonials. They included the testimony of Berwin Warnken, Mrs. Warnken's husband, to the effect that "his wife was almost entirely dependent on him from June 1980 to June 1982" and that "while hospitalized, his wife was unable even to feed herself and was confined to a wheelchair for several months after being released from the hospital." (Tr. 13.) The ALJ found Mr. Warnken to be "a strong witness regarding the severity [of] symptoms prior to the date last insured and specifically the June to July 1980 hospitalization . . . ." The ALJ also noted statements from several lay witnesses regarding "alleged gait, coordination, and speech problems . . . ." These witnesses included a staff nurse at the hospital where Warnken was treated in June and July 1980 and the woman who supervised Warnken in her last job. Other than the observation that Mr. Warnken was a "strong witness," the ALJ did not assess the credibility of these witnesses or consider their statements because their observations "were not supported by longitudinal hospital treating notes, including observations from nurses, physical therapists, or by office notes from primary treating doctors." (Tr. 13.)

---

[7]This is a mischaracterization of the record, as I later explain.

## *II. ANALYSIS*

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision. A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. Id. at 960-61; Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. See Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Boock v. Shalala, 48 F.3d 348, 351 n.2 (8th Cir. 1995); Smith, 982 F.2d at 311.

### *Applicability of SSR 83-20*

Warnken's primary assertion of error is that the ALJ applied the wrong legal standard by concluding that he was unable to consider any evidence other than medical evidence to determine the onset of disability. As I shall explain, I agree with Warnken.

A Social Security Administration policy statement, SSR 83-20, available at 1983 WL 31249, gives guidance on determining the disability onset date. Generally, it provides that when the onset of disability from a progressive disease must be inferred, lay evidence from family members, friends, and former employers should be used to establish the onset of disability, to the extent that evidence does not conflict

-10-

with the medical evidence of record. The ALJ who decided Warnken's claim determined at the hearing that he was "bound by the available objective medical evidence" and did not consider lay evidence as to the onset of Warnken's disability from multiple sclerosis. (Tr. 13.)

On appeal, Warnken asserts that SSR 83-20 applies and required the ALJ to consider the evidence from lay witnesses regarding the onset of her disabilty. The Commissioner asserts that SSR 83-20 does not apply to Warnken's claim, because it applies only in cases where the ALJ finds a claimant disabled and then must determine the date of onset. According to the Commissioner, since the ALJ found that Warnken was not disabled, SSR 83-20 is inapplicable and lay evidence cannot be used to determine the onset of the disability. (Filing 19, D.'s Br. at 6.)

The Eighth Circuit has rejected the Commissioner's argument. In a 1997 case, the Commissioner argued that "SSR 83-20 applies only for the limited purpose of determining the precise date of onset where the ALJ has already found that a claimant had established her disability and her entitlement to benefits." Grebenick v. Chater, 121 F.3d 1193, 1200 (8th Cir. 1997). The Eighth Circuit disagreed, noting

> [w]e cannot agree with the Commissioner's construction of SSR 83-20. The introduction to SSR 83-20 explains that the determination of the onset date is critical because "it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits." This language plainly indicates the ruling is intended to apply to cases such as the one at bar.

Id. (quoting SSR 83-20, emphasis in original).

In Grebenick, the parties agreed that the claimant was not working and had established that she suffered some symptoms of multiple sclerosis prior to the expiration of her insured status. They also agreed that this met the claimant's burden

through step two. Id. at 1198. At step three, the claimant had some medical evidence to support her claim that she was disabled before expiration of her insured status, but relied primarily on medical evidence documenting her condition *after* expiration of her insured status, a treating doctor's retroactive assessment of onset, and subjective lay evidence regarding onset. Id. at 1199. The court noted the need for the ALJ to consider lay evidence regarding onset of disability:

> In a case involving a degenerative disease such as multiple sclerosis, where a claimant does not have contemporaneous objective medical evidence of the onset of the disease, the ALJ must consider all of the evidence on the record as a whole, including the lay evidence and the retrospective conclusions and diagnosis of her doctor.

Id. at 1199.

Warnken is in the same position as the claimant in Grebenick: She had symptoms of multiple sclerosis prior to expiration of insured status, and it is necessary to determine the onset of her disability.[8] Although the ALJ did not expressly find that Warnken has suffered some symptoms of multiple sclerosis prior to expiration of her insured status, the record clearly indicates that she did. (Tr. 244 (1978 multiple sclerosis diagnosis with signs and symptoms supporting diagnosis).) The ALJ considering Warnken's claim should have considered the evidence supplied by lay witnesses in the manner specified by SSR 83-20. He clearly did not.

On remand, all of the precepts of SSR 83-20 will apply, and not just those regarding lay witness testimony to establish onset of disability. For instance, SSR 83-20 provides that "[i]n determining the date of onset of disability, the date alleged by

---

[8]By this, I do not mean that Warnken has established disability by establishing that she suffered from symptoms of multiple sclerosis prior to the expiration of her insured status. According to the Eighth Circuit, symptoms are not enough. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984).

the individual should be used if it is consistent with all the evidence available." SSR 83-20, available at 1983 WL 31249 at *3. Additionally, and "[p]articularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established. In such cases, consideration of vocational factors can contribute to the determination [of onset of the disability]. Id.

As I have concluded that I must reverse and remand because the ALJ applied the wrong legal standard, I need not consider Plaintiff's assertions that there is no substantial evidence in the record to support the ALJ's decision that Warnken was not disabled prior to expiration of her insured status because (1) the ALJ mischaracterized the record and (2) the ALJ failed to obtain an opinion from a medical advisor. However, I briefly address these assertions to provide guidance on remand.

### *Mischaracterization of the Record[9]*

The ALJ's decision suggests that he considered that Warnken was not diagnosed with multiple sclerosis until 1982. (Tr. 13 ("the medical record prior to June 1982 consists only of two hospital workups in 1978, which suggested MS, and Dr. Moell's 1982 diagnosis of MS").) Yet a treating neurologist stated on April 14, 1978 that Warnken "has multiple sclerosis" and clinical signs and symptoms in the record support this finding. (Tr. 244.) That 1978 diagnosis is consistent with the diagnostic standards then in use. As diagnostic standards for multiple sclerosis have changed since 1978, and now utilize MRI testing which was not available in 1978, the ALJ may have applied today's diagnostic criteria to a diagnosis made in 1978. It appears the ALJ was unmindful of the fact that multiple sclerosis is a diagnosis of exclusion and that no single test confirms multiple sclerosis.

---

[9]I recognize that some of these mischaracterizations will likely be corrected when SSR 83-20 guides the decision-making on remand.

-13-

The ALJ concluded there was "no objective evidence that the claimant required a cane, walker or wheelchair for long periods prior to June 1982." (Tr. 13.) However Warnken's husband, whom the ALJ found to be a "strong witness regarding the severity [of] symptoms . . . [during] the June to July hospitalization" (Tr. 13) testified at the hearing that Walker used a wheelchair or walker for over a year after her 1980 hospitalization. (Tr. 292.)

The ALJ found there were no observations from nurses to support the lay evidence regarding Warnken's alleged gait, coordination, and speech problems. (Tr. 13.)  Yet Shirley Frerichs, LPN, who cared for Warnken during her 1980 hospitalization at Lutheran Hospital, stated Warnken could not walk, had difficulty with speech, and was "totally dependent" on the nursing staff. (Tr. 87.) Nurses are "other medical sources" who can provide evidence regarding the severity of impairment and whether the duration requirement is met.  20 CFR 404.1513(d)(1) & (e)(2).

One of Warnken's two 1982 admissions at Lutheran Hospital was mischaracterized.  The ALJ found that it "was for gastric problems, not multiple sclerosis and symptoms quickly resolved (Exhibit 1F/109).  No specific testing was performed for multiple sclerosis nor was the claimant referred for physical therapy nor were medications changed."  (Tr. 14.)  The record reflects that Warnken was hospitalized for ten days.  Her medication (cortisone) for multiple sclerosis was increased.  The discharge diagnosis was multiple sclerosis, in addition to other conditions.  (Tr. 228.)

Another 1982 admission at Lutheran Hospital was reflected in the record and not mentioned in the ALJ's decision.  This was a fourteen day hospitalization.  She was on medication for multiple sclerosis and received physical therapy.  (Tr. 225.)

### *Need for Medical Expert to Infer Onset of Disability*

Warnken asserted that SSR 83-20 required the ALJ to obtain the opinion of a medical expert to assist in determining the onset of disability. On reconsideration, an opinion from a medical expert is required only when medical evidence of onset is ambiguous. Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006) (ALJ required to obtain an expert opinion from a medical advisor to determine a medically reasonable date of onset only if the medical evidence regarding onset is ambiguous) (not citing or discussing SSR 83-20); Grebenick, 121 F.3d at 1200-01 (when medical evidence of onset is ambiguous, an ALJ is required to obtain an opinion from a medical advisor to ensure that onset date is based upon a "legitimate medical basis") (quoting SSR 83-20). Here, the medical record is not ambiguous–it is just sparse.

### III. CONCLUSION

IT IS ORDERED that judgment will be entered by separate document providing that the decision appealed from is reversed and this case is remanded for further proceedings consistent with this opinion.

October 3, 2006.　　　　　　　　　　BY THE COURT:

　　　　　　　　　　　　　　　　　　*s/Richard G. Kopf*
　　　　　　　　　　　　　　　　　　United States District Judge